# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

NICOLE LORRAINE B.,[1]      )
                               )
           **Plaintiff,**    )
                               )     **CIVIL ACTION**
**v.**                        )
                               )     **No. 23-2566-JWL**
**MARTIN O'MALLEY,**   )
**Commissioner of Social Security,**   )
                               )
           **Defendant.**   )
_____)

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security finding medical improvement related to Plaintiff's ability to work on April 11, 2017, and finding that she has not become disabled again since that date. Finding no error in the Commissioner's final decision, the Administrative Law Judge's decision dated August 25, 2023, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING that decision.

## I.    Background

Plaintiff was found disabled beginning March 10, 1998, and began receiving Social Security benefits. (R. 999). In a continuing disability review, her disability was

---

[1] The court makes all its "Memorandum and Order[s]" available online. Therefore, in the interest of protecting the privacy interests of Social Security disability claimants, it has determined to caption such opinions using only the initial of the Plaintiff's last name.

"determined to have continued in a determination dated December 7, 2011." (R. 999), see also, (R. 114-20). Thereafter, based on a later continuing disability review, it was determined that Plaintiff was no longer disabled as of April 11, 2017. Id., at 1000, see also, Id., at 103, 104.

Plaintiff disagreed with the determination, resulting in a tortuous path of appeal and reconsideration. First, the case was dismissed on January 22, 2019, for Plaintiff's failure to appear at the hearing (R. 108-09), but the Appeals Council remanded on January 9, 2020. for the ALJ to consider whether Plaintiff had good cause for her failure to appear. Id., 111-12. On remand, the ALJ found good cause for the failure to appear, held further proceedings, and on May 28, 2020, found Plaintiff's disability ended on January 16, 2016. Id., 124-34. Plaintiff again appealed and the Appeals Council noted additional evidence not considered and remanded for additional proceedings on November 17, 2020. Id., 145-46. On remand, the ALJ held further proceedings and, on August 4, 2021, issued a decision finding Plaintiff's disability ended April 11, 2017. Id., 1122-37. The Appeals Council denied Plaintiff's request for review; id., 1148; and Plaintiff appealed to this court. Id., 1156-57. Before this court, Defendant confessed error and the court granted her unopposed motion to remand on January 25, 2022. Id. 1160. On remand, the Appeals Council vacated the ALJ's decision and remanded to a different ALJ with instructions for additional proceedings. Id., 1164-66. After further proceedings, the ALJ issued a decision after remand on April 20, 2023; id., 1038-53; and an amended decision after remand on August 25, 2023. Id., 999-1014. When the Appeals Council declined to assume jurisdiction over

the ALJ's amended decision after remand on November 15, 2023, that decision became the final decision of the Commissioner after remand.  (R. 986-92).

Plaintiff filed a Complaint in this court seeking judicial review of the Commissioner's final decision after remand on December 22, 2023.  (Doc. 1).  Briefing is now complete, and the case is ripe for decision.  Plaintiff argues that the Commissioner failed to meet his burden to demonstrate both that Plaintiff has had medical improvement related to her ability to work, and that she is currently able to engage in substantial gainful activity.

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine whether the Commissioner's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).  Consequently, to overturn an agency's finding of fact the court "must find that the evidence not only supports [a contrary] conclusion, but compels it."  I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481, n.1 (1992) (emphases in original).

3

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005); see also, Bowling v. Shalala, 36 F.3d 431, 434 (5th Cir. 1994) (The court "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision.") (quoting Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988)).  Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner has promulgated an eight-step sequential process to evaluate termination of benefits.  Hayden v. Barnhart, 374 F.3d 986, 988 (10th Cir. 2004); Jaramillo v. Massanari, 21 Fed. Appx. 792, 794 (10th Cir. 2001); 20 C.F.R. § 404.1594(f)(1-8).  If at any step a determination can be made that a recipient is unable to engage in substantial gainful activity, evaluation under a subsequent step is not necessary.  20 C.F.R. § 404.1594(f).  In step one, the Commissioner must determine whether the recipient is presently engaged in substantial gainful activity.  Id. § 404.1594(f)(1).  Step two considers whether the recipient currently has a medically severe impairment or combination of impairments which is equivalent to one of the impairments listed in Appendix 1 to subpart P of the regulations.  Id. § 404.1594(f)(2).  If

4

any or all the recipient's current impairment(s) meets or equals a listed impairment, his disability is conclusively presumed to continue.  Id.  In step three, the Commissioner determines if the recipient's impairment(s) which was present at the most recent favorable decision (known as the Comparison Decision Point or CDP) has undergone medical improvement.  Id. § 404.1594(f)(3)&(b)(1).  To determine whether medical improvement has occurred, the ALJ compares "the current medical severity of that impairment(s) which was present at the time of the most recent favorable medical decision . . . to the medical severity of that impairment(s) at that time."  Id. § 404.1594(b)(7) (emphases added).  Medical improvement has occurred when there is a decrease in medical severity, which is shown by "changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)."  Id. § 404.1594(c)(1).

If medical improvement is found in step three, step four involves a determination whether that medical improvement is related to the recipient's ability to work.  Id. § 404.1594(f)(4).  In deciding whether medical improvement is related to the ability to work, the ALJ will compare the recipient's current residual functional capacity (RFC) "based upon this previously existing impairment(s) with [his] prior residual functional capacity."  Id. § 404.1594(b)(7).  "Unless an increase in the current residual functional capacity is based on changes in the signs, symptoms, or laboratory findings, any medical improvement that has occurred will not be considered to be related to [the recipient's] ability to work."  Id. § 404.1594(c)(2) (emphasis added).

5

If, however, the most recent favorable decision was based upon a finding that the recipient's condition met or equaled the severity of an impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App.1), an RFC assessment would not have been made because RFC is not assessed until after consideration of the Listing of Impairments.  Williams v. Bowen, 844 F.2d 748, 750-51 (10th Cir. 1988); compare, 20 C.F.R. § 404.1520(e) (RFC assessed if impairment(s) do not meet or equal a listing), with § 404.1594(c)(3)(i) (if most recent favorable decision was based on a finding the impairment(s) met or equaled a listing, an assessment of RFC would not have been made).  In such a case, where "medical improvement has occurred and the severity of the prior impairment(s) no longer meets or equals the same listing section used to make [the] most recent favorable decision, [the Commissioner] will find that the medical improvement was related to [the recipient's] ability to work."  20 C.F.R. § 404.1594(c)(3)(i).

If the Commissioner determines, at step three, that there has been no medical improvement or, at step four, that any medical improvement is not related to the recipient's ability to work, he will determine that disability continues unless he finds at step five that certain statutory exceptions apply.  Id. § 404.1594(f)(5).  If medical improvement related to the recipient's ability to work is found at steps three and four, the commissioner will determine, at step six, whether all the recipient's current impairments in combination are severe.  Id. § 404.1594(f)(6).  If the recipient's current impairments in combination are severe, the Commissioner will assess her RFC at step seven "based on all [her] current impairments, and consider whether [she] can still do work [she has] done

in the past." Id. § 404.1594(f)(7).  If so, the recipient's disability benefits will be

terminated.  Id.  If not, then the Commissioner will determine at step eight whether (when

considering the recipient's current RFC, age, education, and past work experience) she

can perform other work existing in the economy.  Id. § 404.1594(f)(8).  If so, the

recipient's disability benefits will be terminated.  Id.

   The burden in a termination case is on the Commissioner to show both (1) medical

improvement related to the recipient's ability to work, and (2) that the recipient is

currently able to engage in substantial gainful activity.  Patton v. Massanari, 20 Fed.

Appx. 788, 789 (10th Cir. 2001) (citing Glenn v. Shalala, 21 F.3d 983, 987 (10th Cir.

1994); and 20 C.F.R. 404.1594(a)); Jaramillo, 21 Fed. Appx. at 794 (same).  This eight-

step sequential evaluation process relates to the Commissioner's determination that

Plaintiff's disability ended as of April 11, 2017 and will be considered by the court with

respect to his condition at that time.

## II. Discussion

   The regulations explain,

> To assure that disability reviews are carried out in a uniform manner, that
> decisions of continuing disability can be made in the most expeditious and
> administratively efficient way, and that any decisions to stop disability
> benefits are made objectively, neutrally and are fully documented, we will
> follow specific steps in reviewing the question of whether your disability
> continues.

20 C.F.R. § 404.1594(f).

   Therefore, the court will address the steps in sequence as did the ALJ and will

determine whether the ALJ applied the correct legal standard, whether substantial

evidence supports the ALJ's findings, and whether the ALJ met his burdens to demonstrate that medical improvement has occurred which is related to the ability to work and that Plaintiff is currently able to engage in substantial gainful activity. Since neither party specifically organized their briefs in this manner, the court will not follow its usual practice to summarize the parties' arguments at this point in its decision.

In the "Jurisdictional and Procedural History" section of his decision, before applying the eight-step sequential evaluation process, the ALJ made two findings the court finds appropriate to note here. First, the ALJ noted that the state agency imposed a cessation date for Plaintiff's disability of January 6, 2016, which was adjusted to April 11, 2017. (R. 1000). He determined to use "the date most favorable to [Plaintiff] (April 11, 2017)." Id. He also noted that Plaintiff's representative at the hearing said there were outstanding records which had not been received yet, and the ALJ left the hearing open to receive those records. Id. 1001. He noted that "after waiting 30 days nothing was submitted" and he "sent a Notice of Closing the Record (Ex. 62B [R. 1278-81]), but no response was received" and he closed the record without receiving the alleged records. (R. 1001).

In making his "Findings of Fact and Conclusions of Law" the ALJ first noted that the most recent favorable decision for Plaintiff, or the Comparison Point Decision, from which he would determine whether medical improvement has occurred at step three of his consideration was the decision dated December 7, 2011. Id., 1002 (finding no. 1). He found that at the CPD Plaintiff's impairment was "thoracic/T12 burst fracture from a motor vehicle accident status-post fusion" resulting in an RFC "to perform the full range

8

of sedentary work, but the claimant could not sit for prolonged periods or bend repeatedly.  She was also determined to need excessive breaks." Id. (finding no. 2) (bold omitted).  At the first step of the evaluation process, he found Plaintiff has not engaged in substantial gainful activity.  (R. 1002).

Applying the second step of the process, the ALJ found that since the cessation date of disability, April 11, 2017, Plaintiff has had the current impairments of "degenerative disc disease of the lower thoracic and upper lumbar spine status-post laminectomy and fusion; obesity; depressive disorder; anxiety disorder; and polysubstance disorder." Id. 1002-03 (finding no. 4) (bold omitted).  He found that these impairments, individually or in combination, do not meet or medically equal the severity of any impairment in the Listing of Impairments.  Id., 1003-05.

At step three, the ALJ found medical improvement occurred on April 11, 2017 because by that time there had been a decrease in the medical severity of Plaintiff's burst fracture—the impairment that was present at the CPD on December 7, 2011 ("thoracic/T12 burst fracture from a motor vehicle accident status-post fusion."  (R. 1002; see also, R. 116, 118, 184-86)).  Id., 1005-06.  The ALJ provided four bases for his finding of medical improvement; CT scans of the thoracic and lumbar spine in May 2013 showing "posterior fusion from T12 to S1, but no evidence of compression fracture, focal disc herniation, or cord compression at any level" (citing R. 814, 817-18); Dr. Diener's February 2017 opinion that Plaintiff "could lift and carry 20 pounds occasionally and 10 pounds frequently, has no limitations in her ability to sit, and could sit for six to eight hours and stand or walk for two to four hours in an eight-hour workday:" the fact that

Plaintiff "has had almost no treatment for her back since 2016;" and her hearing testimony that "she is no longer taking any pain medications, not even over-the-counter medications." (R. 1006).

At step four of the evaluation process, the ALJ assessed Plaintiff's current (April 11, 2017) RFC attributable to her impairment (burst fracture of the lumbosacral spine at T12 on L1) at the time of the CPD (December 7, 2011):

> to perform a range of light work, in that she can lift and carry up to twenty pounds occasionally and lift or carry up to ten pounds frequently; stand and/or walk for six hours out of an eight-hour workday; and sit for six hours out of an eight-hour workday. The claimant should never climb ladders, ropes and scaffolds; and can occasionally climb ramps and stairs, stoop, kneel, crouch, crawl, and balance as defined by the SCO. The claimant should never work at unprotected heights or with moving mechanical parts; and can occasionally work in vibration.

Id. (finding no. 7) (bold omitted).

The ALJ based this RFC finding on the fact the 2013 CT scans "did not show any evidence of hardware failure, focal disc herniation, or cord compression at any level," and "still did not show any disc herniation or spinal canal compromise at any level." Id. He found Plaintiff "has not presented with any chronic motor, sensory, strength, or reflex deficits reasonably consistent with her allegations, only subjective complaints of pain." Id. He noted a CT scan in June 2020 produced certain findings which provide some support for her allegations of back pain, but "physical examinations at that time continued to be unremarkable, with no weakness, neurological deficits, or gait abnormalities notes, and other than some grimacing with bending at the waist, the claimant showed no signs of distress." Id.

The ALJ also relied on Plaintiff's lack of treatment or prescription pain medication between 2017 and 2020. (R. 2007). He considered her testimony she had not sought treatment because she had no insurance, and explained his consideration:

> Although she testified that she had not sought treatment because she did not have insurance, there is no persuasive evidence that the claimant was ever denied the aid of any public or private institution, program or individual to help defray the costs of treatment. Indeed, despite her allegations that she could not get medical care, she was able to obtain care at GraceMed (a low-income clinic) in June 2020. The claimant was being prescribed heavy doses of narcotic pain medications until January 2017, which ordinarily could provide some support for her subjective complaints. However, there is also evidence of drug seeking behavior and the claimant later acknowledged that her pain medications led to heroin and heavy methamphetamine abuse. She also admitted that she abused her oxycodone pills. Thus, despite apparent access to low-cost care, the claimant has not returned to GraceMed or any other source for treatment for back pain. I also note that she has not presented to the emergency room or urgent care for treatment either. Therefore, the claimant's lack of treatment over the last several years is inconsistent with her allegations of disabling pain and physical limitations.

Id.

The ALJ found, in making this RFC assessment, that Plaintiff's current allegations of disabling pain based on the impairment present at the time of the comparison point decision are not consistent with the medical evidence and other evidence in the record. Id. He specifically noted that he did not consider other impairments than that present in the CPD when assessing the current RFC resulting from that impairment. Id.

The ALJ compared the RFC assessed in the CPD with the current RFC he assessed resulting from the impairment in the CPD and determined the medical improvement found at step three is related to the ability to work because the current RFC resulting from that impairment is less restrictive than the RFC in the CPD. Id. (finding no. 8). Because

medical improvement was found at step three, and that improvement was found to be related to the ability to work at step four, step five was not applied in this case.  20 C.F.R. § 404.1594(f)(5).

At step six, the ALJ found since April 11, 2017 Plaintiff continues to have a severe impairment or combination of impairments including "degenerative disc disease of the lower thoracic and upper lumbar spine status post laminectomy and fusion, obesity, depressive disorder, anxiety disorder, and polysubstance disorder.  (R. 1007).  The ALJ then assessed Plaintiff's RFC at step seven "[b]ased on the impairments present since April 11, 2017."  Id. 1008.  He found Plaintiff has had the RFC

> to perform a range of light work, in that she can lift and carry up to twenty pounds occasionally and lift or carry up to ten pounds frequently; stand and/or walk for six hours out of an eight-hour workday; and sit for six hours out of an eight-hour workday.  The claimant should never climb ladders, ropes and scaffolds; and can occasionally climb ramps and stairs, stoop, kneel, crouch, crawl, and balance as defined by the SCO [(Selected Characteristics of Occupations)].  The claimant should never work at unprotected heights or with moving mechanical parts; and can occasionally work in vibration.  The claimant is able to apply common sense understanding to carry out detailed, but uninvolved instructions in the performance of simple, routine and repetitive tasks in a work environment with no fast-paced production requirements involving only simple, work-related decisions and with only occasional judgment and workplace changes.  The claimant can occasionally respond to and have interaction with supervisors, coworkers and the general public.

Id. (finding no. 10) (bold omitted).

The ALJ stated the regulatory standard to evaluate a claimant's allegations of symptoms resulting from her impairments and summarized Plaintiff's allegations of symptoms.  Id., 1008-09.  He then discounted Plaintiff's allegations of symptoms for the same reasons he discounted Plaintiff's allegations at step four when assessing Plaintiff's

current (April 11, 2017) RFC attributable to her impairment (burst fracture of the lumbosacral spine at T12 on L1) at the time of the CPD (December 7, 2011). (R. 1009). He also found that Plaintiff's "obesity could certainly be contributing to her alleged back pain [but], other than some subjective tenderness and pain-limited range of motion, exams have been unremarkable." Id. He concluded, "Further limitations are not supported by the medical record including treating notes showing normal gait/no distress, normal range of motion/no distress, or the claimant's lack of consistent medical treatment since 2016." Id. 1010 (citations omitted).

The ALJ considered the opinion evidence, including the treating source opinion of Dr. Allen; two opinions from Dr. Diener, a long-term treating source; an opinion of Mr. DeWeese, a physical therapist; and the third-party opinions of Mr. Wong. Id. 2010-11. The ALJ found Dr. Allen's opinion Plaintiff can perform light work was supported by her treatment notes and exams and consistent with Plaintiff's medical history, CT scans in 2013 and 2020, Plaintiff's obesity, and the lack of ongoing treatment, but accorded it only some weight because the records support additional postural and environmental limitations. Id. 1010.

The ALJ accorded only some weight to Dr. Diener's February 2017 opinion, noting Dr. Diener was Plaintiff's treating physician from November 2013 through November 2016, and finding his opinion supported by his treatment notes and consistent with the 2013 CT scans and the lack of any significant weakness on examinations. However, he found the opinion Plaintiff

> could stand/walk for only two to four hours a day is not supported by the
> medical record including, including [sic] the claimant's lack of ongoing
> treatment, [Dr. Diener's] own treating notes showing no significant motor
> or neurological deficits in the lower extremities or gait abnormalities or
> with the other exams showing normal gait/no distress or normal range of
> motion/no distress.

(R. 1010) (citations omitted).  The ALJ accorded Dr. Diener's April 2021 opinion only

little weight because he had not treated Plaintiff since November 2016, because "he did

not provide any other explanation for why the claimant, who was previously capable of a

limited range of light work, was now essentially unable to maintain even any level of

work, … the 2020 CT alone is not remarkable enough to justify these additional

limitations," and the "opinions are also inconsistent with the nominal findings in Dr.

Allen's records and the claimant's lack of treatment since the CT was performed."  Id.,

1010-11.

The ALJ accorded the opinion of Mr. DeWeese, the physical therapist, little

weight.  Id. 1011.  He discounted this opinion because Mr. DeWeese is not an acceptable

medical source, Plaintiff did not complete the testing, and the opinion is inconsistent

with the treatment notes and exams of Dr. Allen and Dr. Diener, with Dr. Allen's

opinion, or with Plaintiff's lack of ongoing treatment.  Id.  Lastly, the ALJ found the lay

opinions of Mr. Wong unpersuasive because he is not a medical source, his opinions are

not based on objective medical examination and testing, are not binding on the Social

Security Administration, and are neither inherently valuable nor persuasive.  Id.

The ALJ also discussed the evidence regarding Plaintiff's mental impairments and

stated his evaluation of the limitations resulting therefrom.

Thus, while the claimant may have some limitations related to depression, anxiety, and polysubstance abuse, mental status examinations have not revealed any serious chronic cognitive deficits or evidence of serious difficulty interacting or communicating with others, beyond her self-reports. Meanwhile, her participation in mental health treatment has been very limited, with her only maintaining consistent follow-up for about eight months in 2019, which suggests that her symptoms are generally tolerable [and] do not seriously interfere with her day-to-day functioning. Moreover, the claimant testified that she is currently staying with a friend of her family, and that she sweeps, does laundry, prepares simple meals, drives twice a week, goes to the Post Office, goes to a store [a] couple times a week, reads inspirational books, and uses the internet and Google/Facebook to interact with her daughters, which further suggests that her activities of daily living are not seriously limited by any psychiatric symptoms. Therefore, while there are no opinions as to the claimant's mental functioning, the evidence as a whole does not reflect signs and symptoms of a severity to preclude her from performing simple, routine, repetitive tasks, making simple work-related decisions, using occasional judgment, adapting to occasional workplace changes, or tolerating occasional interaction with others.

(R. 1012).

Once again, the ALJ discounted Plaintiff's allegations of symptoms because they are inconsistent with the record evidence. Id., see also (R. 2007). The ALJ determined Plaintiff has no past relevant work. Id.

At step eight of the process, the ALJ determined, based upon Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert that Plaintiff is able to perform light, unskilled work in the national economy within the RFC assessed by the ALJ represented by the occupations of clerical router, marking clerk, and photocopy machine operator. Id. 1013.

## III. Analysis

### A. Failure to Comply with the Regulation

Plaintiff argues the ALJ failed to comply with 20 C.F.R. § 404.1594(b)(1) because the laboratory findings show Plaintiff's impairments[2] worsened after the CPD of December 7, 2011, and the ALJ made no comparison between Plaintiff's symptoms or signs at the CPD and at the date of the alleged improvement.  (Pl. Br. 44-45).

At step three of the process, the ALJ is to compare the medical severity of the impairment present at the CPD with the medical severity of <u>that</u> impairment at the alleged date of cessation of disability to determine whether there has been medical improvement. C.F.R. § 404.1594(b)(7).  At step four, the ALJ will determine whether the medical improvement is related to the ability to work by comparing the Plaintiff's RFC at the CPD with her RFC based on that impairment at the cessation date.  <u>Id.</u>  Both medical improvement and the increase in RFC must be based on improvement in signs, symptoms, or laboratory findings.  <u>Id.</u> § 404.1594(c)(1&2).

As noted above, the ALJ found the CPD was the determination dated December 7, 2011, and in that determination Plaintiff was found to have the impairment "thoracic/T12

_____

[2] The ALJ found Plaintiff had one disabling impairment at the time of the CPD, "thoracic/T12 fracture from a motor vehicle accident status-post fusion."  (R. 1002) (bold omitted).  This impairment provided Plaintiff's RFC "to perform the full range of sedentary work, but the claimant could not sit for prolonged periods or bend repeatedly. She was also determined to need excessive breaks."  <u>Id.</u>  It is this impairment, only this impairment, and the functional limitations caused by it at the CPD, which are to be compared at steps three and four of the sequential evaluation process with the limitations caused by this impairment at the time of cessation of benefits to determine whether medical improvement which is related to the ability to work has occurred. 20 C.F.R. § 495.1594(b)(1), (f).  <u>All</u> Plaintiff's current impairments and the functional limitations caused by them are to be used at steps six through eight to determine whether Plaintiff's <u>current</u> impairments are severe, whether she can perform past relevant work, and whether she can perform other work existing in the economy.  <u>Id.</u> § 404.1594(f).

burst fracture from a motor vehicle accident status-post fusion" resulting in an RFC "to

perform the full range of sedentary work, but the claimant could not sit for prolonged

periods or bend repeatedly.  She was also determined to need excessive breaks."  (R.

1002) (finding no. 2) (bold omitted).  The determination dated December 7, 2011, is the

Disability Determination and Transmittal appearing in the record as exhibit 1A.  Id. 93.

"Martha Goodrich, M.D." is reflected as the physician who signed the Determination

with a reference to "See 4734 dated 12/01/2011."  Dr. Goodrich signed a Disability

Determination Explanation (CBDR IN "CBDR claim at the Initial Level") dated

12/01/2011.  Id., at 114-120.  Therein, Dr. Goodrich found Plaintiff "limited to the full

range of sedentary work but is reduced by her inability to sit for prolonged periods or

bend repeatedly."  Id. 118.  She provided an RFC for the period "01/01/1999 –

05/09/2000," and provided an Additional Explanation of that RFC—"ALJ decision of

less than Sed[entary] fxnl [(functional)] level dated 07/14/1999 is adopted for the period

of assessment."  Id., 117, 118.

In the Disability Hearing Officer's Decision dated April 12, 2017, which was the

first decision to establish a cessation date of disability of April 11, 2017,[3] id., at 182-93,

the hearing officer also noted, "There was a CBDR decision dated 12/07/11, which was

---

[3] The court notes that the disability hearing officer's decision determined, "The failure to
cooperate exception to medical improvement standard" applied, and for that reason
determined benefits ceased.  (R. 188).  She determined the cessation date was April 11,
2017.  Id., 192.  The ALJ did not rely on this decision to find cessation of disability for a
failure to cooperate.  Rather, he independently applied the eight-step process and
determined Plaintiff's disability had ceased on April 11, 2017.  He merely relied on this
decision to aid in determining which potential cessation date was "the date most
favorable to the claimant."  Id. 1000.

an adoption of the findings of the ALJ decision dated 07/14/99, therefore, the CPD for comparison purposes is 07/14/99 for CDBR and title 2." Id. 184. Thus, the impairment causing disability at the CPD is the same impairment as that causing disability at the initial finding of disability on July 14, 1999—Plaintiff's "thoracic/T12 burst fracture from a motor vehicle accident status-post fusion"—and the resulting RFC is the same RFC determined on July 14. 1999—"to perform the full range of sedentary work, but the claimant could not sit for prolonged periods or bend repeatedly. She was also determined to need excessive breaks." (R. 1002) (finding no. 2) (bold omitted); see also (R. 118).

As Plaintiff recognized in arguing the ALJ failed properly to compare the severity of her impairment and her functional limitations caused thereby at the CPD with the severity of that impairment and the functional limitations caused by that impairment at the cessation date, the record evidence establishing the severity of that impairment at the CPD is "X-rays of the lumbosacral spine on 9/29/98 [which] showed slight wedging deformity of L1 with associated slight degenerative change and no evidence of loosening of hardware." (Pl. Br. 44) (citing R. 708) (emphasis in Plaintiff's Brief). It is unclear whether the evidence cited in Plaintiff's Brief is a report of X-rays, a CT Scan, or an MRI, as it is a report from Southwest Radiology Inc., Southwest MRI & CT, L.L.C, and does not specify the type of imaging upon which it is based. (R. 708). It states:

LUMBOSACRAL SPINE:

DIAGNOSIS:  Harrington rods in place with findings most consistent with old compression deformity of L1.

COMMENT:  The alignment of the vertebral bodies is satisfactory. Slight wedging deformity of L1 with associated slight degenerative change is

noted.  Harrington rods are noted in situ, extending to the T10 level through L3.  I see no evidence of loosening of the hardware.  No destructive lesion is noted.

(R. 708).

Plaintiff relies on the CT scans from 2013 and 2020 to claim Plaintiff's

impairments have worsened after the CPD:

> CT [scan] of the thoracic spine on 5/9/13 – 4 years prior to the ALJ's finding Plaintiff medically improved on 4/11/17 - showed no acute findings and old postoperative changes of posterior fusion procedure from T10-T11 inferiorly into the lumbar spine.  ([R.] 814).  CT [scan] of the lumbar spine showed posterior fusion from T12 all the way down to S1 with bony fusion dorsally, pedicle screws L3-S1, anterior interbody fusion devices at L3-L4, L4-L5, and L5-S1, laminectomy at L2-L3, L3-L4, L4-L5, and L5-S1, and calcifications in the right lateral recess at L3-L4, L4-L5, and L5-S1.  No new abnormalities were noted.  ([R.] 817).  On 6/18/20, CT [scan] of the lumbar spine showed postop laminectomy and posterior fusion at L3-S1; diffuse interspinous fusion from T11-L3.  There was severe degenerative disc disease at T10-11 with endplate sclerosis and irregularity and a vacuum sign.  ([R.] 941-942).  There was disc narrowing of all the intervertebral discs from T10-L3 with fusion of the discs from T10-L3 and L3-S1.  ([R.] 942).

(Pl. Br. 44-45).

However, while the CT scans relied upon by Plaintiff demonstrate differences in

the imaging findings from the CPD date, they do not demonstrate worsening in the

medical severity of Plaintiff's back impairment or that Plaintiff's RFC on April 11, 2017,

resulting from her back impairment has not improved.  In discussing the 2013 CT Scan of

the thoracic spine, Plaintiff recognized there were no acute findings, but omitted the very

next statement in the radiologist's impression, "No evidence of cord compression in the

thoracic spine."  (R. 814).  As to the 2013 CT Scan of the lumbar spine, Plaintiff

discussed most of the findings including that there were no new abnormalities, but left

19

out the next sentence—"No significant central stenosis."  (R. 817).  Moreover, she

completely omitted the radiologist's impression, "Posterior fusion from T12 down to S1.

Laminectomy L2 to S1. No significant central stenosis.  Neural foramina are patent."  Id.

Regarding the results of the 2020 CT Scan, Plaintiff appears to mix the Osseous findings

and the radiologist's Impressions which the court quotes, "1.  Postop laminectomy and

posterior fusion at L3-S1.  2.  Diffuse interspinous fusion from T11 through L3.  3.

Diffuse degenerative disc disease of the lower thoracic and upper lumbar spine."  Id. 942.

Plaintiff makes no mention of the radiologist's comments that the spinal canal and the

soft tissue were "unremarkable."  Id.

     The CT Scans certainly indicate that the structural condition of Plaintiff's lower

spine was different at and after the time medical improvement was found when compared

to the CPD, but that does not demonstrate it was medically worse.  Plaintiff asserts it was

worse, based upon a selective reading of the raw findings of the CT Scans, and thereby

implies (without citing medical authority) that she, or her counsel, have the medical

expertise to make that determination, that the ALJ should have done so, and that this

court should accept her assertion.  However, neither this court, the ALJ, nor Plaintiff's

counsel possess the expertise to make that determination, although the court notes, based

upon many years of deciding Social Security cases, that the CT Scans' references to a

lack of central canal or neural foraminal stenosis suggests no medical worsening.

     The question for the court is, what did the ALJ decide, and is that decision

supported by the evidence.  The ALJ found a decrease in the medical severity of

Plaintiff's back impairment because; the 2013 CT Scans showed "no evidence of

20

compression fracture, focal disc herniation, or cord compression at any level;" Dr. Diener "opined that the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently, has no limitations in her ability to sit, and could sit for six to eight hours and stand or walk for two to four hours in an eight-hour workday; … the record reflects that the claimant has had almost no treatment for her back since 2016;" and Plaintiff testified "during the hearing in July 2021, she is no longer taking any pain medications, not even over-the-counter medications." (R. 1006).

The ALJ found at step four that by April 11, 2017, considering the effects remaining from the lumbosacral spine impairment present at the CPD Plaintiff had the RFC "to perform a range of light work, in that she can lift and carry up to twenty pounds occasionally and lift or carry up to ten pounds frequently; stand and/or walk for six hours out of an eight-hour workday; and sit for six hours out of an eight-hour workday. The claimant should never climb ladders, ropes and scaffolds; and can occasionally climb ramps and stairs, stoop, kneel, crouch, crawl, and balance as defined by the SCO. The claimant should never work at unprotected heights or with moving mechanical parts; and can occasionally work in vibration." Id. (finding No. 7) (bolding omitted). The ALJ found this increase in functional capacity was related to the ability to work for many of the same reasons he found a decrease in medical severity at step three. Id., at 1006-07. He also noted Plaintiff "has not presented with any chronic motor, sensory, strength, or reflex deficits reasonably consistent with her allegations, only subjective complaints of pain; … exams have not documented any other significant motor or neurological deficits, such as weakness, diminished sensation, or an abnormal gait." Id. 1006. He found

21

Plaintiff had not presented to urgent care or an emergency room for care.  Thus, it is clear the ALJ applied the correct legal standard at steps three and four of the sequential evaluation process for evaluating continuing disability and did, in fact, make the correct comparisons regarding medical improvement.  Plaintiff makes other arguments of error which will be addressed hereinafter, but her argument the ALJ failed to comply with the regulation is without merit.

### B. Evaluating Medical Opinions and Medical Evidence

Plaintiff claims error in the ALJ's evaluation at step seven (RFC assessment at the date of cessation of disability based on all impairments present at that time) of the medical opinions of the two treating physicians, Dr. Diener and Dr. Allen, and of the other medical source opinion of the physical therapist, Mr. DeWeese.  (Pl. Br. 32-39). Plaintiff notes that the ALJ accorded some weight to Dr. Diener's 2017 opinion but argues he erroneously rejected Dr. Diener's limitation to standing and/or walking 2-4 hours a day because he did not properly apply the supportability factor and relied solely on the consistency factor when evaluating that limitation.  Id. 32.

As noted supra at 13-14, the ALJ found Dr. Diener's opinion supported by his treatment notes and consistent with the 2013 CT scans and the lack of any significant weakness on examinations, but he found the opinion Plaintiff is limited to stand/walk 2-4 hours a day is not supported by Plaintiff's lack of ongoing treatment, Dr. Diener's own treating notes showing no significant motor or neurological deficits, or gait abnormalities, or with other exams showing normal gait, no distress, or normal range of' motion.  As Plaintiff points out, the regulations explain supportability as "The more a medical source

presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion." 20 C.F.R. § 404.1527(c)(3).  Consistency, on the other hand relates to the consistency of the medical opinion with the record as a whole.  Id. § 404.1527(c)(4).  Plaintiff ignores that the ALJ found Dr. Diener's 2017 opinion generally supported by his treatment notes.  In other words, he found Dr. Diener generally presented relevant evidence in his treatment notes to support his 2017 opinion.  Thus, the ALJ considered the supportability factor when weighing Dr. Diener's opinion.  Moreover, it is apparent he was considering the same supportability factor when he noted that Dr. Diener's treatment notes do not contain relevant evidence to support finding a limitation to stand/walk 2-4 hours a day.  It is also true that the ALJ relied on more evidence relating to the consistency factor than the supportability factor when rejecting this limitation.  That is not error.  The ALJ is required to consider all the regulatory factors when weighing a medical opinion or other medical source opinion.  He did so here, and the record evidence supports his findings. That the record contains other evidence put forward by Plaintiff which might support a contrary finding is of no import.  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.  [The court] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."  Lax, 489 F.3d at 1084 (citations, quotations, and bracket omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

The ALJ found Dr. Allen's treating source opinion that Plaintiff could perform light work was also worthy of weight because it "is supported by her treatment notes and exams, … is also reasonably consistent with [Plaintiff's] medical history, the CT showing diffuse degenerative disc disease with no evidence of nerve compression, [Plaintiff's] obesity, and [Plaintiff's] lack of ongoing treatment." (R. 1010). He explained he accepted that part of the opinion but accorded the opinion only some weight "because the medical record also supports adding postural and environmental limitations due to degenerative disc disease and obesity." Id. Dr. Allen's opinion Plaintiff could perform light work is further record evidence supporting the ALJ's discounting Dr. Diener's opinion Plaintiff could stand or walk only two to four hours in a workday. Plaintiff's arguments against Dr. Allen's opinion (ALJ could have rejected it, it does not outweigh Dr. Diener's opinion, Dr. Diener treated Plaintiff for a much longer period) simply asks the court to reweigh the opinions, according greater weight to the facts Plaintiff prefers than to the facts relied upon by the ALJ. As noted above, the court "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision." Bowling v. Shalala, 36 F.3d at 434 (brackets in original).

The ALJ accorded little weight to Mr. DeWeese's opinion because his testing was not complete, Mr. DeWeese is not an acceptable medical source, and his opinion was inconsistent with; "the treatment notes and exams from Dr. Allen and Dr. Diener, Dr. Allen's opinion …, and [Plaintiff's] lack of ongoing treatment." (R. 1011). Plaintiff acknowledges Mr. DeWeese is not an acceptable medical source but her arguments

24

against the ALJ's other reasons to discount his opinion largely seek to have the court reweigh the evidence more favorably to Plaintiff's position, which it may not do. Plaintiff's argument the ALJ erred in stating Dr. Allen sent her to Mr. DeWeese does not change the analysis because on the first page of his report, Mr. DeWeese listed Dr. Allen as Plaintiff's physician (R. 944) which provides a reasonable basis to find there was a referral. In any case, the ALJ did not rely on the supposition of Dr. Allen's referral as a basis to discount the opinion. While Plaintiff argues the ALJ erred in finding lack of cooperation and relying on incomplete testing, the fact remains Plaintiff "discontinued the test," despite Mr. DeWeese's characterization of it as being "due to pain levels and inability to continue." (R. 945). All the ALJ's findings, as noted above, are supported by the record evidence, and the evidence cited by Plaintiff does not <u>compel</u> a different finding.

The court notes that Plaintiff claims the ALJ improperly substituted his medical expertise for that of Dr. Diener and Dr. Allen when he "repeatedly cite[d] the 2013 and 2020 CT scan[s] as inconsistent with Plaintiff's allegations of disability, noting there was no hardware failure or cord compression." (Pl. Br. 39). This argument is without merit. While the ALJ did cite the CT scans as inconsistent with <u>Plaintiff's</u> allegations of disability, he did not cite them as inconsistent with either of the physician's opinions or argue that the physicians did not evaluate the CT scans medically correctly. Rather, when evaluating each physician's opinion discussed above, he found the opinion consistent with the CT scans, but reduced the weight accorded the opinion to only "some weight" for other reasons he specifically stated, as noted above. Plaintiff has shown no

error in the ALJ's evaluations of the opinion evidence or use of the CT scans as medical evidence.

### C.    Consideration of Failure to Continue Treatment

Plaintiff argues it was error for the ALJ to repeatedly fault her for failing to obtain treatment for her back after 2016.  (Pl. Br. 40).  She argues she "did seek treatment at GraceMed Health Clinic in June of 2020 but she could not afford to continue treatment because she had no insurance (and no Medicare) and no money."  Id.  She argues, "GraceMed, however, still has a sliding fee scale for those without insurance; a minimum payment of $25.00 per visit is required and with no proof of income, a $220.00 deposit is required.  Of course, this only covers office visits, not testing."  Id.  She argues the inability to afford treatment is a legitimate excuse for no treatment and the ALJ must consider other reasons a claimant does not seek treatment.  Id. 41.

The ALJ discussed Plaintiff's failure to seek treatment for her back after 2016:

> Although she testified that she had not sought treatment because she did not have insurance, there is no persuasive evidence that the claimant was ever denied the aid of any public or private institution, program or individual to help defray the costs of treatment.  Indeed, despite her allegations that she could not get medical care, she was able to obtain care at GraceMed (a low-income clinic) in June 2020.  The claimant was being prescribed heavy doses of narcotic pain medications until January 2017, which ordinarily could provide some support for her subjective complaints.  However. there is also evidence of drug seeking behavior and the claimant later acknowledged that her pain medications led to heroin and heavy methamphetamine abuse (Ex. 16F/2-3; 21 F/4, 22).  She also admitted that she abused her oxycodone pills (Ex. 21F/22).  Thus, despite apparent access to low-cost care, the claimant has not returned to GraceMed or any other source for treatment for back pain.  I also note that she has not presented to the emergency room or urgent care for treatment either.  Therefore, the claimant's lack of treatment over the last several years is inconsistent with her allegations of disabling pain and physical limitations.

26

(R. 1007).

The record reveals Plaintiff received treatment for her back from Dr. Diener in Arizona throughout late 2016. Id., 782-84. There is a note in Dr. Diener's records dated 1/20/17 stating, "pt has not called office phone to schedule, pt informed not to return." Id. 842. On April 19, 2019, Plaintiff presented at Valeo Behavioral Health Care in Topeka, Kansas and provided an intake interview. Id., at 828-36. In that interview, Plaintiff noted she had "been homeless two years going from place to place." Id. 828. She reported she, "Decided she needed a change and left Arizona where she was living from place to place to Topeka, Ks. Her mother lives here, has two of her children staying here." Id. 831. The record reveals that two days later she came to the Stormont Vail emergency department complaining of depression. Id. 889.

The record confirms the ALJ's analysis of Plaintiff's failure to seek treatment for her back. The fact Plaintiff sought out and received low-cost or free treatment at Valeo Behavioral, at Stormont Vail emergency department, and at GraceMed in Topeka reveals Plaintiff knows how to seek free or low-cost treatment. The fact she did not do so in Arizona suggests, as the ALJ found, that her back pain was not as severe as she alleges. The fact she sought treatment for her mental health issues but not for her back impairment also suggests that her back pain was not as severe as she alleges. Plaintiff's argument the ALJ should have considered other reasons Plaintiff may not have sought treatment points to no record evidence suggesting another reason not to seek treatment beyond Plaintiff's allegation of financial inability, which the ALJ considered and appropriately discounted.

Finally, the ALJ found the date of cessation of Plaintiff's disability is April 11,

2017.  Id. 1000.  Thus, the real issue is why Plaintiff did not seek treatment between

January 2017 and April 2017.  Plaintiff was receiving treatment through December 2016

but apparently was not cooperating with Dr. Diener's office practices and was dropped as

a patient.  Beyond Plaintiff's allegation of inability to pay (which was apparently not an

issue in December 2016, and which the ALJ properly discounted) the record reveals no

reason Plaintiff could not secure treatment from another provider.  Moreover, the ALJ

properly extended the timeline of consideration until the date of his decision because he

must also determine whether Plaintiff may have become disabled once again.  The court

finds no error in the ALJ relying on Plaintiff's failure to seek treatment for her back after

2016 through 2020.

### D. Plaintiff's Mental Impairments

Plaintiff argues the ALJ failed his duty to develop the record as to a material issue

in this case because he failed to order a psychological examination and a report of

Plaintiff's mental functional limitations resulting from his mental impairments of

depressive disorder, anxiety disorder, and polysubstance disorder.  (Pl. Br. 45-46).  She

also implies the file contains insufficient evidence to assess a mental RFC in this case.

Id. 46.

The ALJ provided a mental RFC assessment in this case:

The claimant is able to apply common sense understanding to carry out
detailed, but uninvolved instructions in the performance of simple, routine
and repetitive tasks in a work environment with no fast-paced production
requirements involving only simple, work-related decisions and with only
occasional judgment and workplace changes.  The claimant can

28

> occasionally respond to and have interaction with supervisors, coworkers
> and the general public.

(R. 1008) (finding no. 10) (bold omitted).  He also provided an extensive explanation for

his findings.  Id., at 1011-12.

As Plaintiff argues, "The ALJ has a duty to develop the record as to material

issues even when Plaintiff was represented by counsel."  (Pl. Br. 42-43); See also, Henrie

v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir. 1993).

> Nonetheless, in cases such as this one where the claimant was represented
> by counsel, "'the ALJ should ordinarily be entitled to rely on the claimant's
> counsel to structure and present [the] claimant's case in a way that the
> claimant's claims are adequately explored,' and the ALJ 'may ordinarily
> require counsel to identify the issue or issues requiring further
> development.'"  [Branum v. Barnhart, 385 F.3d 1268, 1271 (10th Cir.
> 2004)] (quoting Hawkins v. Chater, 113 F.3d 1162, 1167 (10th Cir.1997)).

Maes v. Astrue 522 F.3d 1093, 1096 (10th Cir. 2008).

In the latest hearing in this case, the ALJ questioned Plaintiff regarding her mental

impairments (R. 1076-77) and her counsel, who also represents her in this case,

mentioned in his opening statement that Plaintiff's "mental health has in fact

deteriorated," but did not further question her or ask the ALJ to seek a medical opinion

regarding her mental impairments.  Id. 1073   At the end of the hearing, the ALJ noted

that he was leaving the record open to receive additional treatment notes from Dr. Allen

and then asked counsel, "is there anything else we need to discuss today regarding this

matter?"  Id. 1089-90.  Counsel responded, "Nothing further."  Id. 1090.  In these

circumstances Plaintiff's implying that the ALJ failed his duty to develop the record or

that the record is insufficient to assess a mental RFC ignores that the ALJ assessed an

RFC, and that counsel did not request a psychological consultation or argue the record as to mental impairments is insufficient.  Thus, the questions for the court are:  Based upon the record, what additional evidence was necessary to assess an RFC? and, what additional mental functional limitations does the evidence require?  The court finds the answer to both questions is, none.

The only evidence Plaintiff relies upon to assert that a psychological consultation was required is that the ALJ recognized that no psychological medical opinion was in the record.  (Pl. Br. 42).  However, a medical opinion regarding functional capacity is not required, "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion."  Chapo v. Astrue, 682 F.3d 1285, 1288 (10th Cir. 2012) (citing Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004)); Wall, 561 F.3d at 1068-69).

Although an ALJ is not an acceptable medical source qualified to render a medical opinion, "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record."  Howard, 379 F.3d at 949.  "And the ALJ's RFC assessment is an administrative, rather than a medical determination."  McDonald v. Astrue, 492 F. App'x 875, 885 (10th Cir. 2012) (citing Social Security Ruling (SSR) 96-05p, 1996 WL 374183, at *5 (July 1996)).  Because RFC assessment is made based on "all of the evidence in the record, not only the medical evidence, [it is] well within the province of the ALJ."  Dixon v. Apfel, No. 98-5167, 1999 WL 651389, at **2 (10th Cir. Aug. 26, 1999); 20 C.F.R. §§ 404.1545(a), 416.945(a).

Moreover, Plaintiff suggests error in the mental RFC assessed but points to no record evidence compelling the inclusion of greater or additional mental functional limitations than those assessed.  The court has reviewed the mental limitations assessed, the record evidence in this case, and the ALJ's explanation of his assessment of Plaintiff's mental impairments and finds no additional or greater mental limitations are compelled by the record evidence.

As explained herein, the Commissioner has met his burden both to show medical improvement related to Plaintiff's ability to work since the comparison point decision on December 7, 2011, and to show Plaintiff is currently able to perform substantial gainful activity.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated November 26, 2024, at Kansas City, Kansas.




s/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**